IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 03 CR 71-3 |
| ) | |
| ALBERT SPAN, ) | Judge Joan H. Lefkow |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Albert Span was convicted by a jury in November 2004 of several crimes arising from his involvement in drug trafficking and subsequent threats he made to witnesses prior to trial.[1] (Dkt. 190.) His conviction was affirmed on appeal and a motion under 18 U.S.C. § 2255 was denied. Although Span received a reduction of sentence under Amendment 750 to the United States Sentencing Guidelines in 2014, he now moves for a further reduction under the First Step Act and two amendments to the Guidelines promulgated after his last resentencing. The motion (dkt. 400) is denied in part and continued in part.

**BACKGROUND**

Most significantly for present purposes, Span's counts of conviction included participating in a conspiracy to distribute and possess with intent to distribute more than 50

---

[1] Specifically, Span was convicted of conspiring to distribute more than 500 grams of cocaine, more than 50 grams of cocaine base, and heroin, within 1,000 feet of a public housing authority residential property, in violation of 21 U.S.C. § 846 (Count 1); using a telephone to facilitate the commission of narcotics offenses, in violation of 21 U.S.C § 843(b) (Counts 3, 7, 8, and 10); possessing with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1) (Count 9); and attempting to intimidate two other persons with the intent to influence, delay, and prevent those persons' testimony in an official proceeding, in violation of 18 U.S.C. § 1512(b)(1) (Counts 11 and 12). (Dkts. 136, 189, 259.)

1

grams of mixtures containing crack cocaine.[2] (Dkt. 136 at 1.) The evidence presented at Span's trial has been summarized in various prior rulings and the court will summarize here only the evidence related to the crack conspiracy.

Span was part of a drug ring that operated in the St. Stephens apartment complex on the west side of Chicago. (Dkt. 294 at 1.) Span was recruited to the ring by Richard Epps, an old friend who was the leader of the operation. (*Id.*; dkt. 258 at 91.) Span's principal job was to supply the heroin the ring sold. (Dkt. 294 at 1; dkt. 258 at 91-93.) Two other men, Donnie Allison and LaShon Stuckey, were recruited to be the principal distributors of heroin and crack, respectively. (Dkt. 294 at 1.)

The evidence against Span included recordings of phone calls the government intercepted through a wiretap active on Epps's phone between November 7 and December 6, 2001. (Dkt. 258 at 18, 38-39; *see also* dkts. 373-74.) Epps and Allison also cooperated with the government after their arrests and testified at Span's trial. (Dkts. 258, 228, 228-1, 234.)

The evidence showed that in fall 2001, Epps decided to open a heroin and crack selling operation at the St. Stephens complex. (Gov't Memo at 5; dkt. 258 at 89.) Epps recruited Allison, Stuckey, and their associates to conduct the street level deals. (*Id.*; dkt. 258 at 89-91.) Epps introduced Allison to Span so that Allison could obtain the heroin to sell from him. (*Id.*; dkt. 258 at 91.)

---

[2] The court will use the terms "crack cocaine" and "cocaine base" interchangeably in this opinion. The statute Span was convicted of conspiring to violate, 21 U.S.C. § 841(b)(1)(A)(iii), prohibits the manufacture and distribution of "cocaine base," a term which the Supreme Court has held includes but is broader than the substances colloquially called "crack." *DePierre* v. *United States*, 564 U.S. 70, 72, 131 S. Ct. 2225 (2011) (defining cocaine base as "cocaine in its chemically basic form"). The term "crack" has "no precise chemical definition" and "generally refers more to the way the drug is prepared and used than the specific chemical composition." *United States* v. *Bryant*, 557 F.3d 489, 498 (7th Cir. 2009) (citation omitted). The evidence in this case all related to crack in the colloquial sense.

In November 2001 Epps also obtained a kilogram of cocaine powder from a man named Tommy Parra that he intended to convert into crack for street-level sale. (Dkt. 258 at 104-05; dkt. 228 at 168; dkt. 228-1 at 294-95.)[3] Parra "fronted" this cocaine powder to Epps, *i.e.*, provided it on credit. (Dkt. 228 at 42; dkt. 258 at 95.) Epps testified that he discussed the prospect of obtaining this cocaine powder with Span. (Dkt. 228 at 62.) Epps also testified that he tried to convert the powder into crack but was unsuccessful because the powder was "bad quality." (Dkt. 258 at 105.) Epps thus returned the powder to Parra. (*Id.* at 105-06.)

The government introduced a recording of a November 22 phone call between Epps and Span in which Span asked about the status of the cocaine powder (Epps testified they had discussed the cocaine powder prior to the phone call) and Epps responded that it was "garbage." (Dkt. 228 at 61-62, dkt. 373 at 121-125.)

The government also introduced recordings of a series of calls between Epps and Stuckey on November 21 and 22 in which Stuckey said he wanted to be fronted 2¼ ounces of crack to sell. (Dkt. 228 at 51-53, 55, 63; dkt. 373 at 104, 110, 126.)

In closing argument the government told the jury it should find Span responsible for conspiring to distribute more than 50 grams of crack, as charged, because the conspirators intended to "cook [the powder] up and sell parts of it . . . two and a quarter ounces, which is sixty something grams. . ." (Dkt. 228-3 at 38, 24.) The jury did so, convicting Span of all charges. (Dkt. 190.)

At the time Span was convicted, the Supreme Court had granted certiorari on *United States* v. *Booker*, 542 U.S. 956, 125 S.Ct. 11 (2004), and *Booker*'s pendency created uncertainty as to whether factual findings necessary to a Guidelines calculation needed to be made by a jury

---

[3] Where the page numbering of the transcripts entered on the court's CM/ECF system differs from the page numbering stamped on the transcripts by that system, the court here refers to the former.

beyond a reasonable doubt. (*See* dkt. 294 at 4.) The court and parties thus agreed to submit several sentencing factors to the jury after it returned a guilty verdict. (*Id.*) The jury then found the following with respect to the counts listed below:

- Counts 1, 3, 7, 8, & 10: Span conspired to distribute or possess with intent to distribute 500 grams or more but less than 1.5 kilograms of cocaine base, and 80 grams or more of heroin.
- Count 1: Span was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive.
- Count 9: Span possessed with intent to distribute 10 grams or more but less than 20 grams of heroin, and was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive.
- All Counts: Span committed the acts alleged in the indictment while under a criminal justice sentence, and less than two years after release from imprisonment on a sentence of imprisonment exceeding one year and one month.

(Dkts. 195, 196, 197.)

The probation office prepared a Presentence Investigation Report ("PSR") that calculated Span's Guidelines range as life in prison. (Dkt. 423-1 at 18.) The predominant factor in Span's Guidelines calculation was the quantity of drugs for which he was responsible under U.S.S.G. § 1B1.3, which generally provides that all members of a conspiracy are responsible for any reasonably foreseeable acts of a conspirator in furtherance of the conspiracy. The PSR based its Guidelines calculation on findings that Span was responsible for 1 kilogram of crack, 500 grams of cocaine (separate from the crack), and 90 grams of heroin. (Dkt. 423-1 at 9.)

The PSR states that Span should be held responsible for 1 kilogram of crack because that was "the amount of cocaine Span purchased from Parra, and was to cook into cocaine base."[4] (*Id.*) The PSR states that Span should be held responsible for 90 grams of heroin because the jury found him responsible for at least 80 grams of heroin with respect to the conspiracy count and at

---

[4] As is evident from the statement of facts above, the PSR here misstated the evidence presented at trial: Span did not purchase the kilogram of cocaine powder from Parra; rather Parra "fronted" the cocaine to Epps.

4

least 10 grams of heroin with respect to the possession with intent to distribute count. (*Id.*) The PSR does not explain its finding that Span should be held responsible for 500 grams of cocaine as distinct from the crack, other than asserting that this finding was made "[p]ursuant to the jury's verdict"—presumably the initial verdict of guilty as opposed to the sentencing verdict. (*Id.*) The PSR describes this substance only as "cocaine," a term that includes but is broader than cocaine powder under the relevant statute. *DePierre*, 564 U.S. at 73; 21 U.S.C. § 841(b)(1)(A)(ii). As will be discussed further below, however, it is clear that the PSR is referring to the cocaine powder Epps obtained from Parra.

The PSR's drug quantity findings as to cocaine powder and heroin differed from the government's recommendations. (Dkt. 423-1 at 38-39.) The government recommended holding Span responsible for 80 grams of heroin rather than 90 grams and did not recommend finding him responsible for any amount of cocaine apart from the crack. (*Id.*)

The PSR's drug quantity findings resulted in a base offense level of 36 under the Guidelines.[5] (*Id.* at 9.) The PSR further called for a 2-level enhancement because Span engaged in criminal activity within 1,000 feet of public housing, a 4-level enhancement because Span led and organized at least five people in the conspiracy, and a 2-level enhancement because Span threatened two witnesses who testified against him. (*Id.* at 9-10.)

Span had one prior felony conviction for possession with intent to distribute cocaine, which resulted in a criminal history category of III. (*Id.* at 13.) Based on an offense level of 44

---

[5] The PSR calculated Span's base offense level by converting his drug quantities into "marijuana equivalents," as the Guidelines called for at the time. (PSR at 6); U.S.S.G. § 2D1.1. One kilogram of cocaine base equated to 20,000 kilograms of marijuana, 500 grams of cocaine powder equated to 100 kilograms of marijuana, and 90 grams of heroin equated to 90 kilograms of marijuana. (*Id.*) This totaled 20,190 kilograms of marijuana, which corresponded to a base offense level of 36. (*Id.*)

5

and a criminal history category of III, Span's Guidelines range was life. (*Id.* at 18.) The court imposed that sentence. (Dkt. 259.)

Span appealed his conviction and sentence. (Dkts. 253, 294.) The court appointed an attorney to represent him in the appeal, but that attorney moved to withdraw under *Anders* v. *California*, 386 U.S. 738, 87 S. Ct. 1396 (1967), stating that he could not discern a nonfrivolous issue for appeal. (Dkt. 294 at 2.) The Court of Appeals addressed the potential issues identified by counsel's *Anders* brief, including challenges to Span's sentence, and affirmed. *United States* v. *Span*, No. 05-3171 (7th Cir. July 14, 2006); (*see* dkt. 294).

Span subsequently filed a *pro se* motion for relief under 28 U.S.C. § 2255, which this court denied. *Span* v. *United States*, No. 07-cv-2543, dkt. 43 (Aug. 3, 2010). The Court of Appeals declined to certify an appeal. No. 11-1066 (7th Cir. July 22, 2011).

In October 2013, Span moved for a reduced sentence pursuant to Amendment 750 to the Guidelines, which reduced the offense levels attributed to various quantities of crack consistent with changes made to crack-related mandatory minimums by the Fair Sentencing Act. (Dkt. 358); *see generally Dorsey* v. *United States*, 567 U.S. 260, 269-70, 132 S. Ct. 2321 (2012). Span's motion assumed that he was responsible for the drug quantities listed in his PSR: 1 kilogram of crack, 500 grams of cocaine powder, and 90 grams of heroin. (Dkt. 358 at 8.) Using those drug quantities, Span argued that his amended Guidelines range was 360 months to life. (*Id.*) The government agreed that Span was entitled to relief and with his amended Guidelines calculation. (Dkt. 365 at 1.) The court resentenced Span to 360 months. (Dkt. 366.)

In May 2018, Span filed a *pro se* motion for leave to file a successive collateral attack in the Court of Appeals, which the court denied. No. 18-2071 (7th Cir. May 21, 2018.)

Span now moves for a reduced sentence seeking relief under the First Step Act and under Amendments 782 and 790 to the Guidelines, which were promulgated after his last resentencing.[6] As will be described further below, Amendment 782 reduced the offense levels attributed to a broad range of drug quantities and Amendment 790 modified the language of U.S.S.G. § 1B1.3 regarding responsibility for jointly undertaken criminal activity. Span argues that he is eligible for a sentence as low as 292 months upon application of those amendments.

## ANALYSIS

### I. Relief Under The First Step Act

As alluded to above, Congress passed the Fair Sentencing Act in 2010 to mitigate the historical disparity in the treatment of crack and powder cocaine offenses. *Dorsey*, 567 U.S. at 263; Pub. L. 111-220, 124 Stat. 2372. Part of that disparity had been a regime of mandatory-minimum sentences that "imposed upon an offender who dealt in powder cocaine the same sentence it imposed upon an offender who dealt in one one-hundredth that amount of crack cocaine." *Id.* The Fair Sentencing Act reduced the crack-to-powder disparity in mandatory minimums from a 100-to-1 ratio to 18-to-1. *Id.*; 124 Stat. 2372, § 2. The Act also authorized the Sentencing Commission to promulgate "conforming amendments" to the Guidelines to "achieve consistency" with the new statutory penalties. *Id.* § 8. The Commission did so through an emergency amendment later made permanent through Amendment 750, which it determined should be applied retroactively. U.S.S.G. Amdt. 750; *Dorsey*, 567 U.S. at 270.

The changes the Fair Sentencing Act made to crack-based mandatory minimums were not retroactive, and thus Amendment 750 only provided relief to defendants sentenced before that Act's passage if their amended Guidelines range was above their pre-Act mandatory minimum.

---

[6] Span was resentenced in April 2014. (Dkt. 366.) The effective date of Amendment 782 was November 1, 2014. The effective date of Amendment 790 was November 1, 2015.

7

*United States* v. *Robinson*, 697 F.3d 443, 445 (7th Cir. 2012). As Span acknowledges, he was one of the defendants who fell into that category and thus was able to obtain relief pursuant to Amendment 750. (Dkt. 400 at 5; dkt. 366.)

In 2018, Congress passed the First Step Act, which made the Fair Sentencing Act's changes to crack-related mandatory minimums retroactive. Pub. L. 115-391, 132 Stat. 5194, § 404 (2018). Specifically, the First Step Act provides: "A court that imposed a sentence for a covered offense may . . . impose a sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 . . . were in effect at the time the covered offense was committed." *Id.* § 404(b). A "covered offense" is defined as "a violation of a Federal criminal statute, the statutory penalties for which were modified by [the Fair Sentencing Act.]" *Id.* § 404(a). Relief under the First Step Act is not available, however, to a defendant whose sentence was "previously imposed or previously reduced in accordance with the amendments made by sections 2 and 3 of the Fair Sentencing Act." *Id.* § 404(c).

Span argues that he is entitled to relief under the First Step Act despite the fact that he previously obtained relief under the Fair Sentencing Act, essentially arguing that the First Step Act authorizes a plenary resentencing proceeding for any defendant convicted of a "covered offense." (*See* dkt. 400 at 6.) Somewhat more narrowly, Span argues that his prior resentencing was not fully "in accordance with" the Fair Sentencing Act because it did not take into account Amendments 782 and 790, which he argues were promulgated in furtherance of that Act. (*Id.* at 7.) The government responds that Span is not permitted further relief because his prior resentencing was fully in accordance with the Fair Sentencing Act. (Dkt. 405.)

While at first blush the government's position appears obviously correct, a close reading of the statute reveals some ambiguity as to what it means for a sentence to have been "previously

8

reduced in accordance with the amendments made by sections 2 and 3 of the Fair Sentencing Act." 132 Stat. 5194 § 404(c). Section 2 of the Fair Sentencing Act modified the amounts of crack necessary to trigger certain mandatory minimum sentences. Pub. L. 111-220 § 2. Section 3 eliminated mandatory minimums for simple crack possession. *Id.* § 3. Neither section, however, granted courts authority to reduce a previously-imposed sentence.[7] *See* 18 U.S.C. § 3582(c)(1)(B). As referenced above, the part of the Act that did that—albeit indirectly—was Section 8, which authorized the Sentencing Commission to promulgate "conforming amendments" to the Guidelines to "achieve consistency" with the Act. *Id.* § 8. The Commission did so, and elected to make that amendment to the Guidelines—Amendment 750—retroactive, which allowed previously-sentenced defendants to seek relief under 18 U.S.C. § 3582(c)(2).

Courts addressing this issue appear uniformly to have held that defendants whose sentences were reduced pursuant to Amendment 750 have been resentenced "in accordance with the amendments made by sections 2 and 3 of the Fair Sentencing Act of 2010." *United States* v. *Curb*, No. 06 CR 324-31, 2019 WL 2017184, at *5 (N.D. Ill. May 7, 2019); *United States* v. *Holmes*, No. CR 02-24, 2019 WL 3859577, at *7 (D.D.C. Aug. 17, 2019); *United States* v. *Garrett*, No. 11-CR-40004-JPG, 2019 WL 1377021, at *2 (S.D. Ill. Mar. 27, 2019); *United States* v. *Martin*, No. 1:05CR21, 2019 WL 3268835, at *2 (N.D. W. Va. July 19, 2019). This interpretation of the statute is the only one that makes sense—without it, no defendant could be said to have been resentenced "in accordance with" the Act. *See Curb*, 2019 WL at *4 ("The only way any sentence has ever been reduced 'in accordance with' the FSA is by means of the conforming amendments to the guidelines") (cleaned up). Span cites no case to the contrary. The

---

[7] The ambiguity discussed in this paragraph does not affect the part of the statute that refers to sentences "previously *imposed* . . . in accordance with the amendments made by sections 2 and 3 of the Fair Sentencing Act," since that Act clearly applied to sentences imposed for the first time after its passage.

court thus agrees with the cases cited above that a defendant was resentenced "in accordance with the amendments made by sections 2 and 3 of the Fair Sentencing Act" if he was resentenced in accordance with Amendment 750.

Span concedes that he was resentenced in accordance with Amendment 750. (Dkt. 400 at 5.) He argues, however, that his resentencing was not fully "in accordance with" the Fair Sentencing Act because it did not take into account all amendments to the Guidelines promulgated pursuant to that Act. (*Id.* at 12 (citing *Curb*, 2019 WL 2017184 at *10 ("the sentencing changes wrought by the [Fair Sentencing Act] included not only the change in the quantities needed to trigger application of the mandatory minimum sentences but also the Guideline amendments necessary to implement those statutory changes")).) Specifically, Span argues that Amendments 782 and 790 were promulgated pursuant to the Fair Sentencing Act and thus that he has not yet obtained all the relief for which he is eligible under that Act. (Dkt. 400 at 7.)

Span is incorrect that Amendments 782 and 790 were promulgated pursuant to the Fair Sentencing Act. That Act instructed the Sentencing Commission to make its conforming amendments to the Guidelines not later than 90 days after the Act took effect. 124 Stat. 2372, § 8(a); *Dorsey*, 567 U.S. at 269-70. The Commission did so in promulgating emergency amendments that were later made permanent via Amendment 750. *Dorsey*, 567 U.S. at 270. Amendments 782 and 790 were promulgated well after 90 days past the effective date of the Act and are unrelated to the emergency amendments the Sentencing Commission promulgated. Rather, Amendment 782 reduced by two levels the base offense levels for a large group of drug offenses—not merely crack offenses—and the Commission's stated reason for adopting the amendment was that it no longer viewed the higher penalties as necessary to achieve penological

goals. U.S.S.G. Amdt. 782; *see also Hughes* v. *United States*, — U.S. —, 138 S. Ct. 1765, 1774 (2018); *United States* v. *Powers*, No. 1:09-CR-211-7, 2019 WL 3812012, at *5 (W.D. Mich. Aug. 14, 2019) ("Amendment 782 was unrelated to the Fair Sentencing Act"). Amendment 790 was implemented to clarify what conduct was relevant to sentencing determinations in offenses involving multiple participants, and the Commission stated that the clarification was "not intended as a substantive change in policy." U.S.S.G. Amdt. 790.

In sum, Span's prior resentencing was fully in accordance with the Fair Sentencing Act, and he is entitled to no further relief under the First Step Act.

## II. Relief Under 18 U.S.C. § 3582(c)(2)

Span also argues that—setting aside the First Step Act—he is entitled to relief pursuant to Amendment 782 under 18 U.S.C. § 3582(c)(2), which permits a court to reduce a sentence if it was based on a Guidelines range that subsequently was lowered by a retroactive Guidelines amendment. *See Ebbole* v. *United States*, 8 F.3d 530, 539 (7th Cir. 1993); U.S.S.G. § 1B1.10(a)(2). As discussed above, Amendment 782 is retroactive and thus affords Span a potential avenue of relief under § 3582(c)(2).[8] U.S.S.G. §1B1.10(d). Span argues that he should only be deemed responsible for 500 grams of cocaine base in applying the amendment and that his corresponding Guidelines range should be 292-365 months. (Dkt. 400 at 2, 11-12.)

The Supreme Court has instructed that proceedings under § 3582(c)(2) are limited in "scope and purpose" and that the statute was "intended to authorize only a limited adjustment to an otherwise final sentence and not a plenary resentencing proceeding." *Dillon* v. *United States*, 560 U.S. 817, 826-27, 130 S. Ct. 2683 (2010). Accordingly, motions under § 3582(c)(2) are to be addressed through a two-step process. *Id.* In the first step, the court must determine whether a

---

[8] Span also argues that he is entitled to relief under § 3582(c)(2) based on Amendment 790, but that amendment is not retroactive. U.S.S.G. §1B1.10(d).

11

new sentence is authorized by § 1B1.10 of the Guidelines, which provides that a new sentence may be imposed only where application of the retroactive amendment would result in a lower Guidelines range, "leav[ing] all other guideline application decisions unaffected." U.S.S.G. § 1B1.10(b)(1); *Dillon*, 560 U.S. at 827. This means that "in deciding a sentence-reduction motion pursuant to § 3582(c), the district court may not make factual findings that are inconsistent with those made during the original sentencing." *United States* v. *Hall*, 600 F.3d 872, 876 (7th Cir. 2010); *see also United States* v. *Koglin*, 822 F.3d 984, 986 (7th Cir. 2016).

If a defendant is eligible for a new sentence within those restrictions, the court may proceed to determine, in its discretion, whether a new sentence is warranted upon consideration of the factors listed in 18 U.S.C. § 3553(a). *Dillon*, 560 U.S. at 827. The court's consideration of the § 3553(a) factors may not "serve to transform the proceedings under § 3582(c)(2) into plenary resentencing proceedings." *Id.*

### A. Whether a Reduction in Sentence Is Authorized

The government argues that even taking Amendment 782 into account, Span's amended Guidelines range is no different than it was at the time the court resentenced him under Amendment 750: 360 months to life. (Dkt. 405 at 20.) The government's calculation proceeds from the premise that at Span's original sentencing the court "adopted the probation officer's findings as to drug quantity and additional aggravating factors." (*Id.* at 3, 20.) That is inaccurate, however.

As discussed above, the PSR found Span responsible for 1 kilogram of crack, 500 grams of cocaine powder, and 90 grams of heroin. (Dkt. 423-1 at 9.) Span objected to the PSR's finding of 1 kilogram of crack, arguing that he should not be held responsible for any amount of crack under the reasonable-foreseeability test. (Dkt. 248 at 1-2 ("[Defendant's] only knowledge was

Epps telling defendant that Parra sold Epps some bad cocaine").) The government's response did not address Span's responsibility for a specific amount of crack but, rather, argued that the jury had made findings as to Span's responsibility for crack and that it would be "inappropriate for the judge to reexamine . . . a factual issue the jury has resolved in the prosecutor's favor beyond a reasonable doubt." (Dkt. 251 at 3-5 (quoting *United States* v. *Rivera*, 411 F.3d 864, 866 (7th Cir. 2005)).)

The court adopted the government's position, stating "the Court finds that the decision was made by the defendant to have the jury determine the drug amounts for which he was responsible. The jury in a separate deliberation made the determination beyond a reasonable doubt as to what drug amounts were attributable to the defendant . . . This determination by the jury will not be second guessed by the Court." (Dkt. 268-1 at 6.) Later in the hearing, the court summed up its conclusions with respect to the PSR as follows: "Based upon the court's review of the presentence investigation report, the Court does believe that the report is accurate in its determinations of the offense level and the criminal history level." (*Id.* at 8.) At no point in the hearing was there a discussion of the quantity of drugs Span was responsible for.[9]

The court believes that its comments at sentencing are best interpreted as meaning what it said: that it adopted the drug ranges the jury found and the offense level recommended by the PSR. It is not entirely uncommon for a court to defer (or overlook) making specific drug quantity findings where they are immaterial to an offense-level determination. *United States* v. *Hall*, 582 F.3d 816 (7th Cir. 2009) (remanding for determination of drug quantity on a § 3582(c)(2) motion where defendant's original sentence rested on a plea agreement acknowledging responsibility for "more than 1.5 kilograms" of crack); *United States* v. *Lake*, 501 F. App'x 574, 575 (7th Cir.

---

[9] The sentencing judge was not the judge who presided over the trial. (*See* Dkt. 238.)

13

2013) (same where drug quantity finding was limited to a range between 500 grams and 1.5 kilograms of crack); *Buffington* v. *United States*, No. 16 C 8632, 2017 WL 1344533, at *3 (N.D. Ill. Apr. 12, 2017) (making drug quantity finding on a § 3582(c)(2) motion where court previously only found defendant "responsible for an amount of drugs qualifying him to an offense level of 38"); *United States* v. *Mitchell*, 828 F. Supp. 2d 576, 577 (E.D.N.Y. 2011) (ordering evidentiary hearing to determine drug quantity on § 3582(c)(2) motion where defendant had withdrawn objection to finding in PSR because it was immaterial to offense level); *see also* Fed. R. Crim P. 32(i)(3) (a sentencing court may elect not to resolve a dispute as to a PSR where it "determine[s] that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing"). It is fairly clear that is what happened here.

The jury's finding that Span was responsible for more than 500 grams but less than 1.5 kilograms of crack compelled the conclusion that Span's base offense level was 36. *See* U.S.S.G § 2D1.1 (2004). The government was correct that the court could not find a crack quantity outside that range. *Rivera*, 411 F.3d at 866-67. And no plausible amount of crack within that range would have resulted in a different offense level.[10]

While the Seventh Circuit has interpreted statements somewhat similar to those made by the court here in adopting the PSR as adopting specific findings within a PSR, those cases are distinguishable. *Davis*, 682 F.3d at 610-20; *United States* v. *Heckel*, 570 F.3d 791, 795-97 (7th Cir. 2009); *United States* v. *Hall*, 600 F.3d 872, 877 (7th Cir. 2010). The opinions in those cases

---

[10] A finding that Span was responsible for an amount of crack at the very highest end of the range—1.496 kilograms or more—coupled with Span's responsibility for 90 grams of heroin would have yielded a base offense level of 37. *See* U.S.S.G § 2D1.1 (2004). There was no evidence to support a finding so high or so precise, however, and neither the government nor the probation office requested such a finding.

all relied on a determination that the PSR in question was accurate or that the defendant's objections to drug quantity findings were immaterial. *Davis*, 682 F.3d at 617 (defendant "has proffered no evidence in the § 3582(c)(2) proceeding to call into question the facts contained in the PSR"); *Heckel*, 570 F.3d at 795-97 (defendant presented no "hard evidence" demonstrating PSR's determination of criminal history category was inaccurate); *Hall*, 600 F.3d at 877 ("Even if we were inclined to agree [that] the court never entered an explicit 17.1-kilogram finding at the original sentencing," the court appropriately did so in appealed-from § 3582(c)(2) ruling).

Here, the PSR is not a reliable basis for imposing sentence. As discussed above, the PSR concluded that Span was responsible for 1 kilogram of cocaine base. (Dkt. 423-1 at 9.) The evidence it relied on in reaching that quantity was Epps's testimony that he was "fronted" a kilogram of cocaine powder and attempted to cook it into crack. (PSR at 7, 9.) The PSR attributed this entire kilogram of cocaine powder to Span as crack, assuming that it would be converted on a 1:1 ratio.

The Seventh Circuit has instructed that assuming a 1:1 powder-to-crack conversion ratio is a "serious error."[11] *United States* v. *Hines*, 596 F.3d 396, 397 (7th Cir. 2010). The Sentencing Commission reports that under "ideal conditions," 1 gram of cocaine powder converts to 0.89

---

[11] As a general matter, "[i]t is appropriate for a district court to attribute to a defendant the conversion of cocaine into crack by the defendant's co-conspirators if that conversion was foreseeable." *United States* v. *Stott*, 245 F.3d 890, 910 (7th Cir. 2001), *amended on reh'g in other part,* 15 F. App'x 355 (7th Cir. 2001). Where the government "cannot prove that *all* of the cocaine was converted to crack . . . it must at least provide some evidence of a conversion ratio to support the district court's finding." *Id.* at 911. The absence of such evidence is clear error constituting grounds for reversal on direct appeal. *Id.* at 910-12; *United States* v. *Soto-Piedra*, 525 F.3d 527, 533 (7th Cir. 2008) (reversing sentence on ground there was insufficient evidence that defendant reasonably foresaw cocaine powder's conversion into 14-15 kilograms of crack, where "nothing was said about quality or yield or 'cooking' when [defendant] probed [buyer's] interest in obtaining 14 to 15 kilograms"). The Seventh Circuit also has instructed courts "to make conservative estimates, especially when presented with generalized testimony, as a way to meet their duties to approximate drug quantities and do so based on trustworthy information." *United States* v. *Henderson*, 58 F.3d 1145, 1152 (7th Cir. 1995)

15

grams of cocaine base.[12] The Seventh Circuit has affirmed a district court's finding that as much as 52% of the weight of cocaine powder would be lost in the conversion to crack.[13] *United States v. Hunter*, 145 F.3d 946, 952 (7th Cir. 1998). Even closer to the point, the Seventh Circuit also has held that it was error for a district court to conclude that a defendant was responsible for 1.5 kilograms of crack where he concededly had sold 30 kilograms of cocaine powder to a buyer who attempted to convert it to crack, but where there was no evidence as to how much was actually converted—the buyer had problems making the conversion—nor evidence of an appropriate conversion ratio.[14] *Stott*, 245 F.3d at 910-12. The court said that the district court's estimate that only 1.5 of the 30 kilograms sold should be treated as crack was "conservative" but nevertheless held it was too speculative to form the basis of a sentence. *Id.* at 912. Similarly, the evidence in this case showed that Epps tried to convert the powder he obtained into crack but failed because the powder was "low quality."[15] Epps then returned the powder to Tommy Parra without selling any of it.

---

[12] United States Sentencing Commission, *Report to the Congress: Cocaine and Federal Sentencing Policy* (May 2007), at 63, *available at* https://www.ussc.gov/research/congressional-reports/2007-report-congress-cocaine-and-federal-sentencing-policy. The Commission does not explain how it arrives at this figure, but it seemingly is referring to an ideal conversion of a molecule of cocaine, an alkaloid with molecular formula $C_{17}H_{21}NO_4$, to cocaine hydrochloride (cocaine powder), a salt with molecular formula $C_{17}H_{22}NO_4Cl$. *See DePierre* v. *United States*, 564 U.S. 70, 74, 131 S. Ct. 2225 (2011); *Hines*, 596 F.3d at 397. The ratio of the molecular weight of cocaine to cocaine hydrochloride is 0.89.

[13] *Cf. United States* v. *Taylor*, 116 F.3d 269, 273 (7th Cir. 1997) (affirming lost-weight ratio of 12%)

[14] *Cf.* U.S.S.G. § 2D1.1, n. 5 ("In an offense involving an agreement to sell a controlled substance, the agreed-upon quantity of the controlled substance shall be used to determine the offense level unless the sale is completed and the amount delivered more accurately reflects the scale of the offense"); *United States* v. *Eschman*, 227 F.3d 886, 890 (7th Cir. 2000) (when estimating conversion rates the court must take into account the "particular defendant's capabilities").

[15] For completeness, the court observes that there is no inconsistency between the fact that no crack was actually produced and the jury's guilty verdict on the conspiracy count. A conspiracy requires only an agreement and an overt act; factual impossibility is not a defense. *United States* v. *Rose*, 590 F.2d 232, 235 (7th Cir. 1978); *cf. United States* v. *Macedo*, 406 F.3d 778, 787 (7th Cir. 2005) ("drug quantity

Although far less significant to Span's Guidelines calculation than his responsibility for crack, the PSR's finding that Span was responsible for 500 grams of cocaine powder is also clearly erroneous. While the jury found that Span conspired to distribute more than 500 grams of cocaine at the guilt phase of the trial, that finding related to the same cocaine powder that Epps purchased from Parra and that Span already was being held responsible for as cocaine base.[16] (*See* Dkt. 423-1 at 39 ("The jury determined . . . that the conspiracy of which Span was convicted involved more than 500 grams but less than 1.5 kilograms of cocaine base [and] more than 500 grams of cocaine . . . The cocaine and cocaine base finding was based upon the one kilogram of cocaine that Epps received from Parra and later attempted to cook into cocaine base.").) The jury's subsequent finding in the sentencing phase that Span was responsible for over 500 grams of crack followed from its verdict at the guilt phase: crack is defined as a subcategory of cocaine under 21 U.S.C. § 841(b).[17] *DePierre*, 564 U.S. at 81-82. The PSR misinterpreted the jury's two findings and thus erroneously double-counted the same substance. *Hines*, 596 F.3d at 397.

Under these circumstances, the court concludes that the PSR's drug quantity findings as to both crack and powder cocaine were errors, underscoring the court's view that it did not adopt them in determining Span's offense level at sentencing.

---

is not an element of the offense . . . under § 841(a)(1)"). As set forth above, there was evidence that Span was aware of Epps's efforts to sell crack. *Stott*, 245 F.3d at 910-11 (sufficient evidence supported crack conviction where defendant was aware that "some" cocaine was being converted into crack). While Span may have had an argument under the cases cited above that there was insufficient evidence to support the jury's finding that he was responsible for 500 grams of crack, any such argument has long been forfeited.

[16] In closing at the guilt phase, the government argued: "You get to consider those drug amounts. And you know what the amount was. It was a kilo. That is a thousand grams. It was powder cocaine. . . And then number two, regarding cocaine [i.e., question number two on the verdict form], was it less than 50 grams, between 50 and 500, or over 500. Again, you heard Mr. Epps tell you that the kilo is a thousand grams, so you should check the over 500 grams." (Dkt. 228-3 at 38; dkt. 190 at 2.)

[17] As noted above, the government's sentencing memo did not call for holding Span responsible for any amount of cocaine powder.

Even if the court were to interpret its statements at sentencing as adopting the PSR's drug quantity findings, the court is persuaded that such generically-adopted findings should not be binding here. While the Seventh Circuit has not spoken directly on this issue, the Ninth Circuit has held that "without an explicit and specific drug quantity finding by the original sentencing judge, drug quantities in an adopted PSR are not binding in § 3582(c)(2) proceedings."[18] *United States* v. *Rodriguez*, 921 F.3d 1149, 1152 (9th Cir. 2019). The court espoused the reasoning outlined above that, where drug quantities do not affect a defendant's Guidelines range, neither the defendant nor the court has sufficient incentive to ensure the PSR's asserted amount is accurate. *Id.* at 1158. Given that, the court said, it is often appropriate or even preferable for a district court simply to adopt the PSR and leave any supplemental fact-finding necessary to potential amended Guidelines calculations to future § 3582(c)(2) proceedings. *Id.* at 1159; *see also United States* v. *Quintieri*, 306 F.3d 1217, 1230 (2d Cir. 2002) (it would "unnecessarily increase the burden on district courts and this court [to require defendants] to litigate every aspect of the sentencing report in the original hearing, even though irrelevant to the immediate sentencing determination, in anticipation of the possibility that, upon remand [from direct appeal], the issue might be relevant").

### B. Further Briefing Is Necessary

Because the court concludes it made no specific finding as to drug quantity at sentencing, it is obligated to make such a finding now. *Davis*, 682 F.3d at 615; *see also Hall*, 582 F.3d at

---

[18] Similarly, in an unpublished disposition, the Fifth Circuit has reversed a sentencing decision on direct appeal on the ground that "the district court's conclusion amounts to a simple adoption of the PSR, failing to specifically make findings as to the quantities of drugs attributable to each defendant based on whether the drugs were within the scope of the conspiracy agreement and reasonably foreseeable to Ramos and Lopez. It is not at all clear to us that such amounts are properly charged to these defendants." *United States* v. *Ramos*, 545 F. App'x 301, 309 (5th Cir. 2013).

819; *Buffington*, 2017 WL 1344533, at *3. Accordingly, the parties are ordered to submit briefs as to the appropriate drug quantities for which Span was responsible under § 1B1.3. The parties are reminded that the court may not make findings that are "inconsistent with the district court's findings at the original sentencing hearing." *Davis*, 682 F.3d at 615. Thus, any recommendations as to crack quantity must be within the range of 500 grams and 1.5 kilograms found by the jury. The parties are directed to devote their primary attention to the existing record.[19] *See Hall*, 600 F.3d at 876 ("in ruling on a § 3582(c)(2) motion, the district court may consider the record as a whole," including the PSR and any addenda thereto); *see also Rodriguez*, 921 F.3d at 1157; *United States* v. *Valentine*, 694 F.3d 665, 670 (6th Cir. 2012). The parties also are directed to address the issue of how the court should handle the problem—familiar to them by now—that transcripts from two days of sentencing proceedings, November 8 and 9, 2004, apparently are missing from both the court's CM/ECF system and the clerk's office. (*See* dkts. 411, 413, 418.)

In accordance with its obligations under the first step of the *Dillon* inquiry, the court observes that a finding as low as 500 grams would result in a lower Guidelines range pursuant to Amendment 782, thus making Span eligible for a reduction in his sentence.[20] *See Dillon*, 560

---

[19] The court also will accept argument that an evidentiary hearing is warranted, although the parties are reminded that section 3582 does not permit plenary resentencing hearings. *See United States* v. *Neal*, 611 F.3d 399, 402 (7th Cir. 2010) (ordering hearing on defendant's conduct in prison on § 3582(c)(2) motion); *see also Mitchell*, 828 F. Supp. 2d at 582 (ordering hearing on drug quantities).

[20] The court is unaware of any authority for the proposition that Span forfeited his ability to challenge his drug quantities by not challenging them in his motion for relief under Amendment 750. (Dkt. 358.) To the contrary, the Seventh Circuit has held that a defendant is entitled to "one bite at the Amendment 782 apple." *United States* v. *Guerrero*, No. 19-1676, 946 F.3d 983, 2020 WL 64478, at *4 (7th Cir. Jan. 7, 2020) (holding defendant's request for counsel that ultimately led to the district court *sua sponte* addressing Amendment 782 did not result in forfeiture of defendant's subsequent Amendment 782 motion). Furthermore, even if Span had successfully challenged his drug quantity findings in his Amendment 750 motion, his recommended custodial range under the 2013 Guidelines would still have been 360 months to life, based on an offense level of 40 and a criminal history category of III. U.S.S.G. §§ 2D1.1(c), 5A (Nov. 2013). Thus Amendment 782 affords him relief that was unavailable at the time of his last resentencing.

U.S. at 827; U.S.S.G. § 1B1.10(a)(2)(B). For example, if the court were to find that Span is responsible for 500 grams of cocaine base, his base offense level would be 30.[21] Applying the enhancements totaling eight levels from his original sentencing, Span's total offense level would be 38.[22] The corresponding Guidelines range for a Category III offender is 292-365 months, which would permit a sentence below Span's current sentence of 360 months. (Dkt. 367.)

## CONCLUSION AND ORDER

Span's motion is denied insofar as it seeks relief under the First Step Act. The motion is continued insofar as it seeks relief under Amendment 782 to the Sentencing Guidelines. The government is ordered to file by 2/28/2020 a position statement as to the drug quantities Span is responsible for under U.S.S.G. § 1B1.3. Span is ordered to file a response by 3/14/2020. The probation office is instructed to prepare by 4/1/2020 a presentence investigation report addressing the factors set forth in 18 U.S.C. § 3553(a) to the extent they are not covered by prior reports, particularly Span's conduct in prison since his last resentencing.

Date: February 4, 2020

_____
U.S. District Judge Joan H. Lefkow

---

[21] 500 grams of cocaine base has a converted drug weight of 1785.5 kilograms and 90 grams of heroin has a converted drug weight of 90 kilograms, yielding a total converted drug weight of 1875.5 kilograms. *See* U.S.S.G. § 2D1.1 cmt. 8. This corresponds to an offense level of 30. U.S.S.G. § 2D1.1.

[22] The enhancements remain unchanged in the current version of the Guidelines. *See* U.S.S.G. §§ 2D1.2(a)(1) (add two levels for proximity to public housing); 3B1.1(a) (add four levels for leading five or more people); 3C1.1 (add two levels for obstruction of justice).